McTaRLAkd, J.,
delivered tlie opinion of the court:
This is an attachment hill which the complainant, as a creditor of W. W. Woodfolk, seeks to set aside certain conveyances made hy said Woodfolk, of his property, and subject the same to the satisfaction of said debt. The first question presented by the-record is this:
The evidence of indebtedness upon which the complainant relies, is a note in the ordinary form, for $7,000, due at twelve months, with interest from date. The defendant, Woodfolk, alleges, and it is in substance admitted, that he, at the same time signed another undertaking written below the note, on the same piece of paper, obligating himself to pay in addition to the interest and whatever taxes the complainant might have to pay upon the note. Upon this ground he prayed for discovery in a cross-bill, ■ and that the entire contract be declared null and void.
We hold that the facts stated constitute no ground for repelling the complainant from the court. The additional contract alleged, though made at the same time, was an *219 independent and collateral contract, and no attempt ever liaving Leen made to enforce it, it constitutes no defense to the note, which is, in itself, lawful and valid.
In all such cases, where the contracts are separate and distinct, the illegal contract may be abandoned, leaving the legal contract unaffected thereby. It is proper to state that the defendant’s counsel have not pressed this question in argument.
The first conveyance attacked by the bill, is a deed made by AY. W. AYoodfolk, on the 18th of [February, 1861, conveying to John Hughes, valuable real estate near Nashville, and his shares of stock in the Union Bank, for the alleged consideration of $15,000.
Although the fraud is denied in the answer of AYoodfolk and Iluges, yet the testimony of Hughes shows very satisfactorily, that the transaction was merely colorable, and made to delay creditors of AYoodfolk. Nothing was paid or intended to be paid at the time, and the entire transaction was rescinded after the filing of this bill, to wit, the 10th of June, 1861. No attempt has been made in argument to sustain this conveyance.
The contest here has been in regard to a deed made by AV. AY. AYoodfolk, on the 31st of January, 1867, conveying to J. T. Quarles, in trust, lands in Jackson county. The deed conveys over three thousand acres, upwards of twenty-five hundred in one tract, and several other tracts, in trust to secure to AVilliam AYoodfolk, a son of AY. AY. AYoodfolk, the payment of the balance of a judgment of $36,576, with interest, from the 15th of April,' 1866, obtained by said AVilliam against his said father on that day, in the circuit court of Chicot county, Arkansas. It appears that AY. AY. AYoodfolk was a man of large fortune previous to and during the late civil war, owning valuable lands and slaves in Tennessee, Arkansas, and Louisiana.
After the close of the war he was largely indebted and heavily pressed for payment; his estate was greatly reduced *220 by tbe loss of bis slaves and other property, resulting from the casualities of the war.
On the 3d of April, 1866, at the city of Memphis, W. W. Woodfolk made and acknowledged a power of attorney, authorizing John. Chapman to confess judgment in his name in favor of Wm. Woodfolk, in the circuit court of Chicot county,- Arkansas, upon a note then exhibited, for $39,425, dated January 1st, 1866. Wm. Woodfolk appeared at the same time and made oath before the commission, taking the acknowledgment of the power of attorney, that he wras the person in whose favor the judgment was to be confessed, and that the transaction was free from fraud; both parties resided at the time in Nashville.
The judgment was confessed, in pursuance of the power, about the 16th of April, 1866. An execution issued and was levied upon a large tract of land belonging to said W. W. Woodfolk, in said county; the same sold aibout the 1st of October, 1866, and bought by said Wm. Woodfolk, for $4,500. It was the balance on this judgment that the deed to Quarles purports to secure.
The deed was acknowledged before the clerk of the county court of Sumner county, both parties, as before stated, residing in Davidson. It provides that if the debt is not paid by the 1st of July, 1867, five months from the execution, the trustee was to sell, on twenty days’ notice, on six and twelve -months’ credit, the equity of redemption being waived.
It clearly appears that W. W. Woodfolk was indebted largely and was hard pressed with his debts.
That he was attempting to -hinder and delay his creditors, his deed to- Hughes, made but a very short time afterwards, clearly shows, as above referred to. A conveyance of so large amount of property for the benefit of his son alone, would certainly raise so strong a presumption of fraud as to require the most satisfactory evidence on the part of the father and son that the transaction was fair, and that the debt was real and bona fide.
*221 Tbe circumstances tinder wbicb tbe power of attorney was made, tbe judgment in Arkansas confessed, and tbe valuable lands there sold and purchased by tbe son, tend strongly to increase this suspicion and to show that tbe purpose was to enable tbe son to absorb as much as possible of tbe large fortune of tbe father and save it from tbe creditors.
To explain this, tbe defendants have introduced a large mass of testimony, in order to make out tbe existence of a just indebtedness from tbe father to tbe son, corresponding with tbe note and judgment in Arkansas. This proof •makes out tbe following state of facts:
That in May, 1868, tbe father and son both being in Nashville, tbe latter was by tbe United States military,ordered out of their lines south; that a contract was then made and reduced to writing, by wbicb tbe son was to go to tbe farm of tbe father in Jackson county, try to keep and take care of tbe slaves, sixty or seventy in number, and other property, and for this service tbe son was to have all tbe stock, surplus produce on tbe farm, and all tbe blooded stock owned by tbe father in Kentucky; that "William, tbe son, complied with tbe contract, went to tbe farm, remained there twelve or eighteen months. Under this contract, it is alleged, be became tbe owner of all tbe stock and property, consisting of a large number of horses, mules, jacks, jennets, cattle, bogs, sheep, bacon, etc.; that some of this property was sold and tbe money was sent to tbe father in Nashville; that most of tbe property was sent to tbe father in Nashville, and by him sold for money. That Wm. Woodfolk took with him to Jackson county, some $18,000 in Confederate money, exchanged it for United States currency, at tbe rate of two or two and one-half for one, and sent tbe proceeds to bis father in Nashville'.
That W. Woodfolk, Sr., tbe father of W. W., and tbe grandfather of Wm. Woodfolk, gave to W. W., $5,500 in money for bis grandson, Wm., Jr., wbicb was never accounted for. That Wm. Woodfolk bought a large *222 amount of personal property at the sale of Wm. Woodfolk, Sr’s, property, and turned it over to his father’, all of which had never been paid for. That W. W. Woodfolk was also indebted to William for services previously rendered, which was also evidenced by the contract of May, 1863.
It is very clear that all this makes an ample indebtedness to support the note in question, if it is real and bona •fide, but it is remarkable that in a case of this character, involving so much of suspicion against the parties, that W. W. Woodfolk and Wm. Woodfolk, who< knew more about all this than any one else, and both of whom were alive and competent witnesses, and neither of them was examined as witnesses, nor is the account given in their answers circumstantial or satisfactory. They alone could tell us what became of the large sums of money received by W. W. Woodfolk for the proceeds of the property from Jackson county, and whether these sums were ever accounted for, and who owned the $18,000 in Confederate money referred to, and, in fact, explain all these transactions. The contract of May, 1863, was, in 'itself, remarkable; by it Wm. Woodfolk became the owner of property out of which lie realized many thousands of dollars, for twelve or eighteen months of sendee — in fact, all the property that was saved. We have no doubt the contract was made, but we think the true- nature of it was simply to1 clothe Wan. Woodfolk with an apparent ownership of the property, in order to> enable him to save it and send it or the proceeds to his father at Nashville. Their subsequent conduct shows this.
If this be not so-, then it would seem to be but the beginning of the scheme which was afterwards carried out, transferring to the son so much of the father’s property.
It is true, Wm. W. Woodfolk was then a man of apparently large fortune, but it was certainly then apparent that bis title to his slaves was becoming very precarious, and his other personal property was greatly exposed to the casualties of war, while his debts were still upon him. Under tírese circumstances, a contract by which he. transferred to his *223 son for the consideration stated, tbe amount of property which it is maintained he acquired under this contract, cerlainy requires explanation. The amount of property is stated by the witnesses to have been about sixty head of horses and mules, seventy head of cattle, five or six hundred hogs, three or four hundred head of sheep, fourteen hogsheads of tobacco, three hundred barrels of corn, five jacks, eight or nine jennets, fourteen head of blooded stock in Kentucky, besides bacon and other supplies. "W-m. Woodfolk was, at the time, a comparatively young man; is not shown to have been previously engaged in any lucrative pursuits, in fact, the written contract of May, 1863, indicates that he had been in the employ of his father for a few years, at a salary of $1,500. It is not shown how he could have become possessed of $18,000 in Confederate money as his own, or how he paid for the property purchased at his grandfather’s sale. W e think it apparent that he simply bid off this property for his father, who was executor, and could not purchase at his own sale.
Without reviewing the testimony at length, it is sufficient to say that we agree with the chancellor that this1 conveyance cannot stand in the way of creditors. It is simply the case of a failing debtor attempting/ to transfer a large and valuable part of his property to his son to save it from his creditors, supported, it. is true, by a fair show of a consideration, and executed with a good deal of system and care, but the purpose, we think, is apparent enough.
It appears that W. W. Woodfolk had, in the year 1866, a large amount of money which he invested in bonds, and which he does not account for.
Thar he wyas endeavoring to cover up his property from his creditors very apparent, and that his son assisted him is equally apparent. First, the Arkansas lands were disposed of, and then the lands in Tennessee. We do not say that there was no indebtedness from W. W. to William Woodfolk; the money left with W. W. by William Wood-folk, Sr., is apparently the best evidence of a real indebted *224 ness. It lias been held in cases where a conveyance is made for the benefit of a creditor, which proves to be fraudulent by construction of law, that it may stand as security for the' real indebtedness; but this is not so where the creditor, as in this case, participates actively in the actual fraud.
The -record shows that subsequent to- the conveyance to Quarles of the Jackson county land, W. W. Woodfolk confessed judgment in the circuit court of Maiury county, in favor of Wm. Woodfolk, for the balance of the Arkansas judgment; the chancellor’s decree declares this judgment void as to complainants.
This question was not raised by the pleadings, nor do we see that the judgment affects the complainant; the decree, in this respect, will be modified. The only relief asked for the comulainants was to have deeds referred to set aside.
The auestion as to the validity of this last mentioned judgment will be left unaffected by this decree.
The costs of this court will be divided.